OPINION.
{¶ 1} Defendant-appellant Timothy Hannah appeals from his conviction and sentence on one count of Murder, two counts of Felonious Assault, and one count of Possessing a Firearm in Liquor Permit Premises. Hannah contends that the prosecutor's use of Hannah's post-arrest silence to impeach Hannah on cross-examination violated his right to a fair trial and to due process. Hannah further contends that the trial court's decision to deny him a continuance due to his medical condition violated his right to a fair trial and to due process. He also contends that the jury's exposure to an oversized photograph of the victim, taken during the victim's life, deprived him of his right to a fair trial and to due process. In addition, Hannah contends that the trial court prejudicially erred in denying his Crim.R. 29 motion for acquittal, because the State failed to present sufficient evidence that he caused the death of the victim. Finally, Hannah contends that the trial court prejudicially erred when it failed to instruct the jury on the defendant's proposed jury instructions on his theory of self-defense.
 {¶ 2} Because the record does not indicate that Hannah receivedMiranda warnings during the period in which Hannah remained silent after his arrest, we conclude that the use of Hannah's post-arrest silence on cross-examination for impeachment purposes does not violate due process of law when Hannah, without coercion, chose to take the stand. We further conclude that the trial court did not abuse its discretion in denying a continuance when the trial was continued once for Hannah to be examined by a physician, and the trial judge relied on the physician's conclusion that Hannah could resume legal activities. We also conclude that the trial court did not abuse its discretion in admitting the pre-death photograph of the victim, because the photograph was relevant and probative for identification purposes. Based on the testimony of the coroner in this case, when the evidence is viewed in a light most favorable to the State, we conclude that the trial court did not err in denying Hannah's Crim.R. 29 motion for acquittal. Finally, we conclude that the trial court did not abuse its discretion in failing to instruct the jury as proposed by Hannah, because the evidence does not support the defense claimed in Hannah's proposed jury instructions, since the already-injured victim was the only remaining member of the African American group in the front room of the bar when Hannah shot him.
 {¶ 3} Accordingly, the judgment of the trial court is affirmed.
 I {¶ 4} On February 24, 2001, Timothy Hannah was with a group of biker friends, at Spanky's Doll House, when a fight erupted between the group of bikers and a group of African Americans. Bouncers initially separated the two groups and attempted to get each group to leave separately. A fight erupted again when Eric Colter, a member of the African American group, threw a chair into the group of bikers. The general manager of the bar and a bouncer tackled Colter. At the same time, some of the bikers began to hit Colter with bottles and pieces of wood. Another biker, Glen Carlisle, then shot Colter in the buttocks. Carlisle later pled guilty to manslaughter for causing the death of Colter.
 {¶ 5} Hannah then fired a gun at a bouncer of the bar, Curtis Gindratt, who jumped back, just avoiding the bullet. Hannah fired another shot at Kenneth Rountree, another bouncer of the bar, just missing Rountree and Chris Remor, the general manager of the bar, as they both dove behind a glass display case to avoid the bullet. Finally, Hannah shot Colter in the back, piercing his spinal cord and severing his aorta. Colter died from his injuries.
 {¶ 6} Hannah was charged with the following: Murder, in violation of R.C. 2903.02(B), with a firearm specification; two counts of Felonious Assault, in violation of R.C. 2903.11(A)(2), with firearm specifications; Illegal Possession of a Firearm in a Liquor Permit Premises, in violation of R.C. 2923.121(A), with a firearm specification; and Carrying a Concealed Weapon, in violation of R.C.2923.12(A). Hannah was found guilty by a jury on all counts except the charge of Carrying a Concealed Weapon. Hannah was sentenced to a total term of forty years to life in prison. From his conviction and sentence, Hannah appeals.
 II {¶ 7} Hannah's First Assignment of Error is as follows:
 {¶ 8} "The prosecutor's comments on the defendant-appellant's post-arrest silence during cross examination violated Mr. Hannah's right to a fair trial and due process guaranteed by the Fifth, Sixth andFourteenth Amendments to the United States Constitution and Sections 10
and 16, Article I of the Ohio Constitution."
 {¶ 9} Hannah contends that the prosecutor's use of Hannah's post-arrest silence for impeachment purposes violated his right to a fair trial and to due process. At trial, Hannah took the stand and testified that his actions in the incident were taken in self-defense. During the prosecutor's cross-examination of Hannah, the following exchange occurred:
 {¶ 10} "Q. Okay. But as a matter of fact, you have never come forward to this second to say that me or one of my friends got shot at; have you?
i."D.J. O'BRIEN: I'll object.
 {¶ 11} "Q. Not once, not ever?
 {¶ 12} "D.J. O'BRIEN: I object, Your Honor, and I'd like to be heard. And this is a very important issue right here.
 {¶ 13} "JUDGE YARBROUGH: Go ahead. Tell me what the basis of your objection is.
 {¶ 14} "D.J. O'BRIEN: Your Honor, I'd like to approach the Bench.
 {¶ 15} "JUDGE YARBROUGH: Okay. Come to Side Bar.
 {¶ 16} "MR. PATZER: Judge, I'll withdraw the question.
 {¶ 17} "D.J. O'BRIEN: Aw, he knows he's . . .
 {¶ 18} "JUDGE YARBROUGH: Question withdrawn.
 {¶ 19} "D.J. O'BRIEN: I wanna make my record. He knows he asked a question he shouldn't have . . ."
 {¶ 20} At this point, the parties were brought into chambers. Defense counsel argued that the defendant had the right to remain silent from the time of his arrest, and the prosecutor argued that the defendant gave up his right to remain silent when he took the stand. The judge overruled the objection, finding that the question was allowable once the defendant took the stand.
 {¶ 21} The prosecutor then resumed his cross-examination of Hannah, as follows:
 {¶ 22} "Q. Mr. Hannah, so far as you awa — are aware, nobody, to this day, to this day, has ever come forward and said that you guys were brutally assaulted by bike — by black guys, shot at, and in fear of your life in that room back there in the middle?
 {¶ 23} "Nobody's ever come forward and said that; have they?
 {¶ 24} "A. I take it they haven't."
 {¶ 25} During a later discussion in chambers, the prosecutor volunteered that questions asked on cross-examination about a defendant's post-arrest silence violate a defendant's right to remain silent, pursuant to Doyle v. Ohio (1976), 426 U.S. 610. The prosecutor then requested that the judge give a cautionary instruction as to the question asked during Hannah's cross-examination. However, the prosecutor noted that the first question was never answered, and was withdrawn, and the second question was never objected to, and was not objectionable. Defense counsel objected to the curative instruction and moved for a mistrial.
 {¶ 26} The next day, the trial court overruled the motion for a mistrial. After reviewing the record, the trial court found that the first question had not been answered, and that Hannah's response to the second question was not fatal. The trial court then gave the following curative instruction to the jury:
 {¶ 27} "JUDGE YARBROUGH: [W]e had a question come up — questions were posed the Defendant, Mr. Hannah, in which he was asked if he had, previous to trial, disclosed certain information. At least one of those questions was not answered. The questions were improper and must be disregarded by you. You are further instructed to ignore and not consider any answer given to such a question.
 {¶ 28} "Finally, you are instructed that the Defendant's silence is not evidence and may never be regarded as evidence nor may you draw any inference from his silence."
 {¶ 29} The United States Supreme Court has held that the Due Process Clause of the Fourteenth Amendment to the United States Constitution is violated when the silence of a defendant, at the time of arrest and after receiving Miranda warnings, is used for impeachment purposes. Doyle v. Ohio (1976), 426 U.S. 610, 619, 96 S.Ct. 2240,49 L.Ed.2d 91. The Miranda warnings contain an implicit assurance that the silence of a defendant will carry no penalty. Id. at 618. Thus, the Supreme Court found "it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." Id.
 {¶ 30} However, this fundamental unfairness is not present where there is no governmental action inducing a defendant to remain silent prior to his arrest. Jenkins v. Anderson (1980), 447 U.S. 231, 240,100 S.Ct. 2124, 65 L.Ed.2d 86. Thus, the Due Process Clause of theFourteenth Amendment is not violated when the silence of a defendant, prior to the time of arrest and before receiving Miranda warnings, is used for impeachment purposes. Id. There is also no violation of theFifth Amendment when the defendant's prearrest silence is used for impeachment purposes, because "impeachment follows the defendant's own decision to cast aside his cloak of silence and advances the truth-finding function of the criminal trial." Id. at 238.
 {¶ 31} The Supreme Court later held that the use of a defendant's post-arrest silence for impeachment purposes does not violate due process where the record does not indicate that the defendant received Miranda
warnings during the period in which the defendant remained silent immediately after his arrest. Fletcher v. Weir (1982), 455 U.S. 603,605, 607, 102 S.Ct. 1309, 71 L.Ed.2d 490. The Court held that "[i]n the absence of the sort of affirmative assurances embodied in the Miranda
warnings, we do not believe that it violate[s] due process of law for a State to permit cross-examination as to postarrest silence when a defendant chooses to take the stand." Id. at 607. The Supreme Court followed the holding by stating that "[a] State is entitled, in such situations, to leave to the judge and jury under its own rules of evidence the resolution of the extent to which postarrest silence may be deemed to impeach a criminal defendant's own testimony." Id.
 {¶ 32} We have previously stated that "if the defendant chooses freely and without coercion to speak on his own behalf, fairness dictates that his credibility can be challenged by prior inconsistent behavior. Even then, however, Doyle prohibits impeachment by post-arrest silence if the defendant has received Miranda warnings." State v. Maggard (June 4, 1999), Montgomery Cty., 1999 WL 355869, at *14.
 {¶ 33} Here, the record does not indicate that Hannah receivedMiranda warnings during the period in which Hannah remained silent after his arrest. Under these circumstances, the use of Hannah's post-arrest silence on cross-examination for impeachment purposes does not violate due process of law, because Hannah, freely and without coercion, chose to take the stand. Therefore, Hannah's First Assignment of Error is overruled.
 III {¶ 34} Hannah's Second Assignment of Error is as follows:
 {¶ 35} "The prejudicial nature of the trial court's decision to deny a continuance violated appellant's rights to due process and to a fair and impartial trial under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Sections 10 and 16, Article I of the Ohio Constitution."
 {¶ 36} Hannah contends that the trial court's decision to deny him a continuance due to his medical condition violated his right to a fair trial and to due process. Hannah argues that it was unreasonable for the trial court to force him to choose between suffering from vertigo or from the side effects of the medication for his vertigo.
 {¶ 37} "The grant or denial of a continuance is a matter which is entrusted to the broad, sound discretion of the trial judge. An appellate court must not reverse the denial of a continuance unless there has been an abuse of discretion." State v. Unger (1981), 67 Ohio St.2d 65, 67,423 N.E.2d 1078 (citations omitted). "The term `abuse of discretion' . . . implies that the court's attitude is unreasonable, arbitrary or unconscionable." State v. Adams (1980), 62 Ohio St.2d 151, 157,404 N.E.2d 144 (citations omitted). There is no mechanical test for determining whether a trial court has abused its discretion in denying a continuance. Unger, 67 Ohio St.2d at 67. "The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." Id.
 {¶ 38} The record shows that Hannah complained of vertigo on the day trial was to commence, but that he was coherent as to time and place, aware of the nature of the proceedings, and able to consult with his attorneys. The trial judge, however, took a recess for Hannah to be examined by paramedics. After examining Hannah, one paramedic testified that Hannah's condition was consistent with anxiety-related symptoms for which Hannah took medication for, but did not take that morning. The paramedic further testified that he found Hannah's vital signs to be within the range of normal, and that Hannah's condition would not interfere with his ability to communicate with his attorneys. The paramedic testified that one of the side effects of Hannah's medication was drowsiness. Both parties later agreed to Hannah getting a complete medical examination. The trial was continued, and Hannah was sent to the hospital for a medical examination.
 {¶ 39} The following day, defense counsel requested a continuance based on Hannah's worsened medical condition. Defense counsel argued that Hannah was in distress, not cogent, and unable to assist in his defense. Although Hannah had taken his medication, defense counsel argued it had not helped his medical condition.
 {¶ 40} The trial judge denied the request for a continuance based on a report, signed by Hannah's physician, on Hannah's medical examination which provided that "Mr. Hannah can resume his legal activities." The trial judge further stated the following:
 {¶ 41} "JUDGE YARBROUGH: Yeah, well, out of an abundance of caution, I believe yesterday sending him to the physician, to the Emergency Room at your request where they'd found nothing of any significance in being allowed to return to counsel in his own defense by a medical doctor, I — the — I know that happened yesterday and this is morning, and — and in fairness, I did report to you that the jail said he was not dressed when he was supposed to bring over [sic] and — and reported to them dizziness and lightheadedness.
 {¶ 42} "But that's the same condition he had yesterday and the same condition that the doctor reviewed. And at that time the doctor did not feel that that would interfere with his ability to go forward."
 {¶ 43} We find no abuse of discretion by the trial court indenying a motion for a continuance when the trial was continued once for Hannah to be examined by a physician, and the trial judge relied on the physician's conclusion that Hannah could resume legal activities. Hannah's physician examined him for the medical condition that he complained would make it impossible for him to stand trial, and found that it would not interfere with Hannah's ability to go forward with "legal activities." Under these circumstances, we conclude that the trial judge was not unreasonable, arbitrary or unconscionable in denying the motion for a continuance.
 {¶ 44} Hannah's Second Assignment of Error is overruled.
 IV {¶ 45} Hannah's Third Assignment of Error is as follows:
 {¶ 46} "The prejudicial impact of the jury's prolonged exposure to an inflammatory picture of the victim deprived the defendant of his right to a fair trial and due process guaranteed by the Fifth, Sixth andFourteenth Amendments to the United States Constitution, and Article I, Sections 10 and 16 of the Ohio Constitution."
 {¶ 47} Hannah contends that the jury's exposure to an oversized photograph of the victim, taken during the victim's life, deprived him of his right to a fair trial and to due process. Hannah argues that the trial court abused its discretion in admitting the photograph, because it was irrelevant and inflammatory. Hannah maintains that the photograph was irrelevant, because the victim had already been identified in the videotape of the incident and in slides shown by the coroner. Hannah also maintains that the photograph was inflammatory, because it pertained to the character of the victim as a church-going family man.
 {¶ 48} "When considering the admissibility of photographic evidence under Evid.R. 403, the question is whether the probative value of the photographic evidence is substantially outweighed by the danger of unfair prejudice to the defendant. The admission or exclusion of such photographic evidence is left to the discretion of the trial court. Accordingly, a trial court may reject an otherwise admissible photograph which, because of its inflammatory nature, creates a danger of prejudicial impact that substantially outweighs the probative value of the photograph as evidence." State v. Morales (1987), 32 Ohio St.3d 252, 257,513 N.E.2d 267 (citations omitted). However, the Ohio Supreme Court has found pre-death photographs to be relevant and probative for identification purposes. State v. Davie (1997), 80 Ohio St.3d 311, 325,686 N.E.2d 245 (citation omitted).
 {¶ 49} We conclude that the trial court did not abuse its discretion in admitting the pre-death photograph of the victim. This was the only pre-death photograph of the victim admitted in evidence. Therefore, the photograph was relevant and probative for identification purposes.
 {¶ 50} Hannah's Third Assignment of Error is overruled.
 V {¶ 51} Hannah's Fourth Assignment of Error is as follows:
 {¶ 52} "The trial court prejudicially erred when it failed to grant defendant-appellant's motion for acquittal pursuant to Ohio Rule of Criminal Procedure 29."
 {¶ 53} Hannah contends that the trial court prejudicially erred in denying his Crim.R. 29 motion for acquittal, because the State failed to present sufficient evidence that he caused the death of the victim, an element of his murder charge.
 {¶ 54} Crim.R. 29(A), motion for judgment of acquittal, provides, in pertinent part, that "[t]he court on motion of a defendant . . ., after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment, information, or complaint, if the evidence is insufficient to sustain a conviction of such offense or offenses." Sufficiency is a test of adequacy and a legal standard that is applied to determine "whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." State v. Thompkins (1997),78 Ohio St.3d 380, 386, 678 N.E.2d 541. A defendant is denied due process if his conviction is based on legally insufficient evidence. Id.
 {¶ 55} When reviewing a denial of a Crim.R. 29 motion for acquittal, an appellate court is to construe the evidence in a light most favorable to the State. State v. Parker, 2002-Ohio-3920, at ¶ 31 (citation omitted). A Crim.R. 29 motion for acquittal is properly denied by the trial court "if the evidence is such that `reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt.'" Id. (citation omitted).
 {¶ 56} Hannah was charged with and convicted of one count of murder. The crime of murder is set out in R.C. 2903.02(B) and provides that "[n]o person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code." Felonious assault, a violation of R.C. 2903.11(A)(2), was the underlying felony in this case.
 {¶ 57} Hannah contends that the State failed to present sufficient evidence that he caused the death of the victim. Hannah maintains that the coroner testified that both bullets that struck the victim were lethal and would have caused the victim's death. Because the other shooter previously pled guilty to manslaughter for causing the death of the victim, Hannah argues that there cannot be sufficient evidence to find that he also caused the death of the victim. We disagree.
 {¶ 58} Dr. Kent Harshbarger performed the autopsy of the victim and testified that the victim was shot two times, once in the buttocks and once in the back. The record shows that the other shooter shot the victim first in the buttocks, and Hannah then shot the victim in the back. Dr. Harshbarger also made the following testimony as to the gunshot wounds:
 {¶ 59} "A. Uh . . . certainly those injuries are significant. Uh . . . both, uh . . . injuries caused damage to blood vessels. Uh . . . in particularly [sic] the one in the back, uh . . . damaged the aorta, which is the main blood vessel traveling down the body carrying the majority of the blood's volume. And once that happens, it's, uh . . . a lethal injury. "Uh . . . that bullet also traveled through — adjacent to the right side of the spinal column, uh . . . which would have damaged the spinal column in that area, preventing, uh . . . — paralyzing him basically from that level down.
 {¶ 60} "Uh . . . the — the one in the buttocks, uh . . . fractured and damaged the pelvis bones, continued across — uh . . . sort of ricocheted across the body through the bladder and the, uh . . ., uh . . . projectile almost exited, or tried to exit at the right groin. But we call, uh . . . — the bullet penetrated the skin, but was not able to get out because it had lost too much energy hitting the bone. So it made it to the skin's surface, but did not exit the body."
 {¶ 61} Dr. Harshbarger was then questioned about the fatality of each gunshot wound. Dr. Harshbarger testified as follows:
 {¶ 62} "Q. Okay. Let's talk about the gunshot wound to the buttocks. Uh . . . and let's make a separate, uh . . ., uh . . . — a separate discussion of that.
 {¶ 63} "Was the gunshot wound to the buttocks a fatal injury?
 {¶ 64} "A. Uh . . . the injuries that resulted from that wound certainly would have been — could have been lethal.
 {¶ 65} "Q. Could have been? All right. Was the gunshot wound to the spinal column or further up the back a fatal injury?
 {¶ 66} "A. That was a fatal injury.
 {¶ 67} "Q. Okay. Is there more or less certainty about the lethality of the shot to the spine?
 {¶ 68} "A. Uh . . . certainly when the aorta was nearly severed in two, that was lethal. There was not — no chance to make it to any health care, uh . . . facility to repair that. Uh . . . he would have been dead, you know — in moments from bleeding — internal bleeding.
 {¶ 69} "Uh . . . the bladder injury certainly, uh . . . could have been lethal, uh . . . from bleeding alone at the scene. Uh . . . let — let alone if E.M.S. services had done — you know, been allowed to perform their service. Whether he could have survived is, uh . . . you know, anyone's guess. With infection rates, uh . . . he was certainly hemorrhaging a great deal from large vessels that are ruptured in the pelvis.
 {¶ 70} "Uh . . . so, I cannot tell, based on those injuries, they are lethal, but we're not given a chance to, uh . . . — to see if he could have survived because of — the second shot clearly is lethal.
 {¶ 71} "Q. Okay. The second shot, is there any question in your mind that that second shot's a fatal shot?
 {¶ 72} "A. Uh . . . like I say, the second shot, uh . . . — because the aorta's shot, uh . . . other circumstances at the scene, I know that's the second shot, and that is clearly lethal.
 {¶ 73} "Q. All right. Now, would Mr. Colter have been able to, uh . . . stand up or remain upright if the first shot had been the one to the spine?
 {¶ 74} "A. He would not have."
 {¶ 75} On cross-examination, Dr. Harshbarger further testified to the following:
 {¶ 76} "Q. All right. So, you did, in fact, ask for the video tape, I guess, and had no problem in your mind and — and you reached a conclusion that each one of these shots is fatal shots, lethal shots; isn't that true?
 {¶ 77} "A. Potentially lethal, yes.
 {¶ 78} "Q. Pardon?
 {¶ 79} "A. Potentially lethal, yes.
 {¶ 80} "Q. Okay. And by potentially lethal, are you — I don't understand the difference here. Is lethal being used interchangeably with fatal? I'm using a term fatal, you're using a term lethal. Tell me, are we talkin' about he same thing?
 {¶ 81} "A. Uh . . . yes.
 {¶ 82} "Q. Okay. And within a reasonable medical probability, isn't it your opinion that you previously expressed that the first shot was, in fact, a fatal wound?
 {¶ 83} "A. In this set of circumstances, yes.
 {¶ 84} "Q. So, within a reasonable medical probability, this person would have died even if he weren't shot the second time?
 {¶ 85} "A. I said within this set of circumstances.
 {¶ 86} "Q. All right.
 {¶ 87} "A. So, no.
 {¶ 88} "Q. So, you're saying now, no, it isn't?
 {¶ 89} "A. No, I'm not.
 {¶ 90} "Q. All right. But it was lethal and it was a fatal wound?
 {¶ 91} "A. In this set of circumstances, it was.
 {¶ 92} "Q. And you're saying that you need to know all the circumstances in order to figure out whether either or both of these shots are fatal wounds?
 {¶ 93} "A. Uh . . . the circumstances of this case, I'm referring to a second shot through the aorta. Once that happened, we don't get the chance to see if he could have survived the shot to the pelvis."
 {¶ 94} Based on Dr. Harshbarger's testimony, we conclude that a reasonable mind could conclude that Hannah caused Colter's death when he shot Colter and nearly severed Colter's aorta. Construing the evidence in a light most favorable to the State, the trial court did not err in denying Hannah's Crim.R. 29 motion for acquittal.
 {¶ 95} Hannah's Fourth Assignment of Error is overruled.
 VI {¶ 96} Hannah's Fifth Assignment of Error is as follows:
 {¶ 97} "The court prejudicially erred in failing to give to the jury the defendant's proposed jury instructions of December 4, 2001 and the defendant's proposed jury instruction #5 said charges not being included in the general charge after a written request by the defendant and said requested charges being a correct statement of law."
 {¶ 98} Hannah contends that the trial court prejudicially erred when it failed to instruct the jury on the defendant's proposed jury instructions on his theory of self-defense.
 {¶ 99} The Supreme Court of Ohio has held that "it is prejudicial error in a criminal case to refuse to administer a requested charge which is pertinent to the case, states the law correctly, and is not covered by the general charge." State v. Scott (1986), 26 Ohio St.3d 92, 101,497 N.E.2d 55 (citation omitted). However, the Ohio Supreme Court also held that "the court may refuse to give an instruction as to a matter which is not applicable to the facts governing the case." Id. (citation omitted). A trial court's failure to give a proposed jury instruction is reversible error if the defendant demonstrates that the trial court abused its discretion, and the defendant was prejudiced by the court's refusal to give the proposed instruction. Jaworowski v. Medical RadiationConsultants (1991), 71 Ohio App.3d 320, 327, 594 N.E.2d 9. "[P]rejudicial error occurs only if the alleged instructional flaw cripples the entire charge." Id. at 327-328 (citations omitted).
 {¶ 100} Hannah's proposed jury instruction #5, on the theory of self-defense, was as follows:
 {¶ 101} "In determining whether or not the Defendant is entitled to claim self-defense in the shooting of Eric Coulter [sic], you may consider the actions of the persons with Eric Coulter [sic] as well as Eric Coulter's [sic] actions. If the behavior of these people showed a concert of action with Eric Coulter [sic] to accomplish some criminal or unlawful purpose, then you are entitled to consider the action of all these individuals on the issue of the Defendant's contention that he acted in self-defense."
 {¶ 102} Hannah's proposed jury instruction of December 4, 2001, requested that the trial court instruct the jury that "[y]ou must consider the conduct of Eric Colter and all the other African Americans with him and decide if their acts and words caused the Defendant reasonably and honestly to believe that he was about to be killed or receive great bodily harm."
 {¶ 103} The trial court instructed the jury, on Hannah's theory of self-defense, as follows:
 {¶ 104} "You must consider the conduct of Eric Colter and decide if his acts or words caused the Defendant reasonably and honestly to believe that he was about to be killed or receive great bodily harm."
 {¶ 105} Hannah contends that the trial court erred in failing to instruct the jury to consider the actions of the persons with the victim in determining whether Hannah acted in self-defense. Hannah contends that the victim was acting in concert with the group he was with, and that Hannah was defending himself against the group rather than just the victim.
 {¶ 106} Although Hannah claims a defense that is valid under a certain set of facts, see State v. Clifton (1972), 32 Ohio App.2d 284,290 N.E.2d 921, the facts of this case do not warrant a jury instruction on this defense. The record shows that a fight erupted on February 24, 2001, between a group of bikers and a group of African Americans at Spanky's Doll House. Witnesses testified that the African American group consisted of Eric Colter, Donte Colter, Dion Owings, Kevin Owings, and Robert Sims. The bouncers at the bar were able to initially break up the fighting and separate the bikers and the African Americans. However, the fighting erupted again when Eric Colter threw a chair into the group of bikers. The general manager of Spanky's Doll House and a bouncer tackled Colter. At the same time, several bikers began to beat Colter with bottles and pieces of wood. Another biker, Glen Carlisle, then shot Colter in the buttocks. Robert Sims and Kevin Owings testified that they headed for the front door when they heard gunshots. Kevin Owings further testified that he observed a fight occurring outside between Donte Colter and another individual.
 {¶ 107} In short, the record shows that when Hannah shot Eric Colter in the back, there were no other members of the African American group in the front room of the bar. Eric Colter, the only member of the African American group remaining in the front room, had already been beaten by other bikers and shot by Glen Carlisle when he was shot by Hannah. In addition, when Hannah shot Colter, he was in an empty doorway leading to the front door exit.
 {¶ 108} Since only the victim remained in the front room of the bar when Hannah shot him, the evidence does not support the defense claimed in Hannah's proposed jury instructions. We conclude that the trial court did not abuse its discretion in failing to instruct the jury as proposed by Hannah, and that Hannah was not prejudiced by the court's refusal to give his proposed jury instructions.
 {¶ 109} Hannah's Fifth Assignment of Error is overruled.
 VII {¶ 110} All of Hannah's assignments of error having been overruled, the judgment of the trial court is affirmed.
BROGAN, J., concurs.