[Cite as *State v. Ream*, 2013-Ohio-4319.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

STATE OF OHIO,

     PLAINTIFF-APPELLEE,             CASE NO. 1-12-39

     v.

JAMES R. REAM,                   O P I N I O N

     DEFENDANT-APPELLANT.

---

**Appeal from Allen County Common Pleas Court**
**Trial Court No. CR20110411**

**Judgment Affirmed**

**Date of Decision: September 30, 2013**

---

APPEARANCES:

    *Michael J. Short* for Appellant

    *Jana E. Emerick* for Appellee

**ROGERS, J.**

{¶1} Defendant-Appellant, James R. Ream ("Ream"), appeals the judgment of the Court of Common Pleas of Allen County, finding him guilty of murder with a firearm specification and sentencing him to 18 years to life in prison. On appeal, Ream contends the trial court erred by: (1) failing to suppress statements made during police interviews after he purportedly invoked his Fifth Amendment Right to counsel; (2) disallowing the testimony of his expert witness; (3) failing to give proper jury instructions; (4) denying his motion for new counsel; and (5) permitting the introduction of prejudicial photographs. Ream also claims that he was denied the effective assistance of counsel. For the reasons that follow, we affirm the trial court's judgment.

{¶2} On November 17, 2011, the Allen County Grand Jury indicted Ream on one count of murder in violation of R.C. 2903.02(A), a felony of the first degree. The indictment also carried a firearm specification. The indictment arose from Ream's alleged shooting of Ronald Ream ("Ron"), his older brother, at 1240 Fairgreen Road, which was the residence they shared ("1240 Fairgreen").

{¶3} This matter has five relevant stages: (1) the pre-trial proceedings relating to Ream's motion to suppress; (2) the pre-trial proceedings relating to the *Daubert* hearing of Ream's expert witness; (3) the pre-trial proceedings relating to Ream's motion for new counsel; (4) the pre-trial proceedings to suppress

prejudicial photographs; and (5) the trial. We address each stage below in sequence.

*Ream's Motion to Suppress*

**{¶4}** On February 6, 2011, Ream filed a motion to suppress his statements made during two police interrogations that occurred on October 18, 2011 and October 20, 2011. He argued that the statements were taken after he invoked his Fifth Amendment right to counsel. The trial court conducted a suppression hearing on March 2, 2011. At the hearing, the following relevant evidence was adduced.

**{¶5}** Detective Mark Baker, from the Allen County Sheriff's Office, testified regarding his role in interviewing Ream. On October 18, 2011, Detective Baker learned that Ream had approached another deputy and stated that he was involved in the murder of Ron. Detective Baker was assigned to speak with Ream while other officers investigated the potential crime scene. Prior to the interrogation, Detective Baker read Ream an advice of rights form, which Ream subsequently signed at 12:52 p.m. After signing the form, Ream agreed to talk with Detective Baker.

**{¶6}** Two days later, on October 20, 2011, Detective Baker had another interview with Ream. Once again, Detective Baker read the advice of rights form to Ream, which Ream signed at 2:20 p.m. Subsequently, Detective Baker began

his interview with Ream. Detective Baker testified that Ream did not exercise his right to counsel during the interview and freely and voluntarily answered all of Detective Baker's questions.

**{¶7}** The advice of rights form contained the following language:

<u>YOUR RIGHTS</u>

BEFORE YOU ARE ASKED ANY QUESTIONS, YOU MUST UNDERSTAND YOUR RIGHTS.

1. You have the right to remain silent.
2. Anything you say can be used against you in court.
3. You have the right to talk to a lawyer for advice before we ask you any questions and to have a lawyer with you during questioning.
4. If you cannot afford a lawyer, one will be appointed for you before any questioning, if you wish.
5. If you decide to answer questions now without a lawyer present, you still have the right to stop answering questions at any time. You also have the right to stop answering at any time until you talk to a lawyer.

<u>WAIVER OF RIGHTS</u>

I have read this statement of my rights, and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

(Suppression Hearing, State's Exhibit 1, 2).

**{¶8}** On cross examination, Ream's trial counsel elicited the following testimony:

Q: Do you remember immediately in the beginning of [the second interview] approximately three and a half (3 ½) minutes in, Mr. Ream saying to you that you're going to have to provide me with a counsel?

A: Yes.

Q: And what was your response?

A: I told him we could talk if we – if he wanted to talk. If he wanted counsel I would get him counsel and I think through that whole interview I I [sic] probably brought that up a half a dozen times.

* * *

Q: Do you remember at approximately three (3) minutes later approximately 6:50 into the statement where [Ream] said to you that he was willing to cooperate but he wanted to have s- [sic] an attorney appointed there so he could talk to him so that he knew how [to] answer the questions?

A: No, he never he never directly asked for an attorney I would have stopped the interview right away.

Q: So, he never stated to you that he wanted an attorney there to assist him in how to answer the questions?

A: No, he said he was willing to talk to me about things that he could remember and he didn't want to talk about things he couldn't remember without an attorney. I told him I understood that. You can answer any question you want and you can refuse to answer anything you want or just can just simply refuse to talk to me altogether.

Suppression Hearing Tr., p. 17-19.

{¶9} After Ream was done with cross-examination, the State moved to admit Ream's signed advice of rights forms and the recorded interview DVDs into evidence.

{¶10} The recordings reveal the following relevant evidence. Once Detective Baker entered the interview room, he introduced himself, gave Ream cigarettes and obtained general information about Ream. Ream was then read his advice of rights form, which led Ream and Detective Baker to have the following exchange:

> Baker: First thing I wanna do though, you are not arrested at this moment, okay? Not technically in custody. I'm going to read you your rights, these items here, one through five are your *Miranda* rights, I'm going to read them out loud for you. You can follow along with this paper. [Reads *Miranda* rights out loud]. Do you understand what those rights mean?
>
> Ream: Yeah. I can give you some basics, but I do need a public defender or somebody to tell me what I should be saying, what I shouldn't.
>
> Baker: Okay, alright. What I am going to do is go through this [form] and have you sign it, that I presented you with your rights.
>
> Ream: [inaudible]
>
> Baker: Hang on a second, one step at a time. Just slow down a bit, now I am going to ask you to sign these consent to search forms okay? This waiver of rights down here this paragraph, will you read that out loud?
>
> [Ream begins to read the waiver paragraph out loud]
>
> Ream: Uhh it says, "I do not want an attorney."

Baker: Yeah, you don't have to agree to that.

[Ream finishes reading the waiver out loud]

Baker: Do you understand what that means?

Ream: Yeah.

Baker: That means you have been provided with your rights and you understand what they are. And if you decide to talk to me now and answer any questions you can stop answering questions at any time, okay?

Ream: Yeah, I'm just going to give you the basics. Because I can't can't [sic] even piece it all together.

(Suppression Hearing, State's Exhibit 3). At this point, Ream signed the advice of

rights form.

{¶11} The interview continued with Ream telling Detective Baker about the

shooting. About 26 minutes into the interview, the following exchange occurred

regarding the assignment of a public defender:

Ream: I will make you a deal. Give me some time to recount what happened. Get a public defender here with me so he can tell me what I am allowed to tell you because it's your job to provide the prosecutor with information and I can't give you information right now, my mind in spinning right now * * *. So please, I provided you with the basics right now, let me rethink what actually happened. Right now I am running a fever. Thank you for the cigarettes * * * that ain't right, I flipped out on him. I sat there for hours not realizing –

Baker: That you shot your brother?

Ream: Yeah, it didn't seem real, so unrealistic.

(*Id.*). Ream then continued to talk to Detective Baker about the incident, without asking for an attorney.

**{¶12}** The second interview of Ream occurred on October 20, 2011. Detective Baker again conducted the interview. Before asking any questions concerning the investigation, Detective Baker asked Ream to once again read and sign the advice of rights form. The following conversation then took place:

> Ream: They're gonna have to provide me with some counsel. I'll be happy to talk to you and fill in the gaps, but right now I'm still trying to remember what the gaps are.
>
> Baker: You are in custody and I do have to read you your rights and we will talk about them. The reason I brought you up today because the prosecutor called me * * * they have, obviously, completed the process of the crime scene * * * there are some questions about certain things that happened based on what you told me yesterday.
>
> Ream: You know what, I'm still drawing blanks.
>
> Baker: Let me ask you this question. I don't want to get into it, without being legal. It is for your protection. If I go over the waiver of rights form with you and go through that process like we did on day one, when we first sat down, can we talk about some of the things that happened?
>
> Ream: I'll tell you this. Let's rehash the last two weeks.
>
> Baker: Ok we can do that. Let's do this [pointing to the waiver] then we'll do that. * * * I don't want you to go through anything without acknowledging that [referring to the waiver].
>
> * * *
>
> [Detective Baker reads the waiver out loud for Ream].

> Ream: Before I sign this, I am more than willing to cooperate, I need to have whoever they assigned [to] me present for any pertinent questions.
>
> Baker: That's fair. We can do this, if you want to talk about certain things that's fine with me.
>
> Ream: I'm gonna help you piece together what led up to all this. That I can do and I know I am in the clear.
>
> Baker: Let me cover my butt here. If you don't want to talk to me without a lawyer we don't have to talk at all.
>
> Ream: Well I can say things up to the incident but I'm still trying to figure out how the incident got started to be honest with you.
>
> Baker: If we come across something that you want to talk to me and we come across something that you don't want to talk about, we don't have to.
>
> * * *
>
> Ream: We'll go ahead and I will sign these papers for you. And we'll start from a couple of weeks ago, and I will tell you what led up to that point, but I am not going to answer anything that I don't know what to tell you.

(Suppression Hearing, State's Exhibit 4). At this point, Ream read the waiver statement out loud and subsequently signed the form.

{¶13} Detective Baker then asked Ream questions regarding what led up to the shooting. Throughout the questioning, Ream answered Detective Baker's questions. However, Ream mentioned a public defender a few times. Nevertheless, after these isolated statements, Ream offered more information

Case No. 1-12-39

about the shooting. Ream's references to a public defender led to the following

discussion:

> Baker: Let me ask you something here. This isn't even about your
> case, it ain't about what you did. A couple of times now you've
> brought up the fact, let me talk to the, whoever my public defender
> will be, do you think your public defender, is it because you don't
> want to talk to me about it without counsel? If that's the case, all
> you have to do it tell me that. Or do you think that, in your mind,
> that talking to the public defender is gonna help you remember some
> things. I am confused now.
>
> Ream: No. So he can tell me what I am allowed to say.
>
> Baker: Are you afraid to tell me some things? Is that it?
>
> Ream: You know what, I can't remember a lot of what actually took
> place right there, because my mind was going about 15 different
> directions before that happened, trying to remember what I couldn't
> take what I needed to do before. And out of the blue, he got really, I
> mean he just he was almost like the devil came over him or
> something you know, that's what I remember * * *.
>
> Baker: You talk a lot and I listen * * * I don't want to sit here and
> I'm not gonna play a tricking game with you. When I read you your
> *Miranda* rights, it's for a reason, and I have to abide by it. If you
> don't, I have some questions that pertain directly to –
>
> Ream: I don't trust me.
>
> * * *
>
> Baker: I guess in my world, most of the time anyway, things are
> black and white. A guy either wants to talk to me or he doesn't.
>
> Ream: I want to, I just can't.
>
> Baker: Or you feel like legally you don't want to talk to me because
> you want to talk to your attorney.

-10-

Ream: Well that's part of it, that's part of it. But the part of it, is I'm blanked out * * *.

Baker: I just kinda wanna distinguish which one of the two it is. Because, if it's Rick legally James R. Ream[1] wants to not talk to me because he wants his attorney, I want to leave the room.

Ream: No, that's not it. Look I know you are a good guy okay, I know what your position is here. I wanna fill in the gaps, I wanna clarify that right here and now. But I can't remember exactly what took place other than him lunging * * *.

Baker: I would never be upset with you, I would never be mad, I would never call you a a a liar or a deceiver for the simple fact you can't remember what happened because so much happened. Like I said, I am just trying to distinguish between whether or not you wanna talk to me about it, about what you can remember, and the gaps you can fill in or if you just don't want to. That's what I am trying to get at.

Ream: The only reason I said that about the legal counsel, is because I think having a mediator here, okay, will help out a little bit. That's what I am saying.

Baker: I am not pressuring you or anything.

Ream: No you're not. No no no no please don't put that on yourself.

Baker: I am not trying to make you talk about anything you don't want to talk about.

(Suppression Hearing, State's Exhibit 4).

{¶14} On April 2, 2011, the trial court denied Ream's motion to suppress.

The trial court found that Ream was properly advised of his *Miranda* rights, he

---

[1] According to the record, Ream's legal name is James R. Ream. However, he prefers to be called Rick.

validly waived them, and he never invoked his right to counsel during either interview.

## Daubert *Hearing*

**{¶15}** On July 9, 2012, Ream disclosed that he intended to call Dr. Matthew Ziccardi as an expert witness at trial. On July 19, 2012, the State filed a Motion in Limine to prohibit Dr. Ziccardi from testifying at trial regarding his July 5, 2012 report. Dr. Ziccardi's report, in relevant part, stated the following:

> After reviewing the records and interviewing Mr. Ream for over four hours, I submit my clinical opinion that he was in a state of shock after the alleged offense and did not act in a rational manner. His actions in the many hours after the alleged offense, including leaving to get gas, money, and breakfast, are inconsistent with an individual trying to elude capture and/or punishment. His mind set was that an individual who was overwhelmed by the event and stricken with grief, shame, and fear. His actions on the following morning, including giving possessions to family members and approaching police, are again consistent with a person who feels he is facing punishment for the situation.
>
> In delving into Mr. Ream's background, he has suffered from mental illness for much of his adult life. He has been hospitalized on two occasions for suicidal ideation and depression and battled substance abuse. He also has a history of poor judgment and decision making, such as living at a homeless shelter despite having the means to support himself. His relationship with his brother was both close and tortured, wherein he idolized his brother but was also bullied by him. This is why he reacted in such an illogical manner after the alleged offense. He simply could not believe his actions, the outcome, or the fact that he was no longer going to be with his brother. Rather than fleeing, he was unable to see any action other than to deal with realities as they presented themselves.

(Docket No. 147, State's Exhibit 1).

{¶16} The State argued that Dr. Ziccardi's expected testimony would not be based on reliable scientific, technical, or other specialized information as required by Evid.R. 702(C). The State also contended that it was not apparent from his report whether Dr. Ziccardi's testimony would address matters beyond the knowledge or experience possessed by lay persons as Evid.R. 702(A) requires. Lastly, the State argued that Dr. Ziccardi's testimony would be irrelevant at trial.

{¶17} On August 1, 2012, the trial court held a *Daubert* Hearing to determine whether Dr. Ziccardi would qualify as an expert witness under Evid.R. 702. The trial court noted that Dr. Ziccardi was qualified under Evid.R. 702(A) and (B); therefore, the contested issues were whether Dr. Ziccardi met the requirements of Evid.R. 702(C) and whether his opinion was relevant.

{¶18} Dr. Ziccardi was asked to do an evaluation and analysis of Ream's actions during the alleged incident and afterwards. Dr. Zicccardi testified that in determining his opinion, he reviewed a psychological evaluation which looked at the questions of competency to stand trial and Ream's mental state at the time of the offense. Dr. Ziccardi also reviewed the several hours of interview conducted by Detective Baker, police reports, and also met with Ream on two occasions for a total of four hours. During his interview with Ream, Dr. Ziccardi gathered historical information about Ream's life and conducted a mental status examination and an objective personality test ("MMPI-2").

{¶19} Dr. Ziccardi testified that he has done similar evaluations before and that the usual procedure or method for such evaluations is a semi-structured interview in which a doctor applies "criteria from known disorders and then ask[s] questions to elicit whether or not the subject patient typically exhibited any of those criteria to try to make a diagnosis." *Daubert* Hearing Tr., p. 8. Dr. Ziccardi further stated that he "reviewed collateral sources of information and conducted a standard psychiatric interview which included acquiring historical knowledge of the subject and also assessing their mental status." *Id.* at 11. Dr. Ziccardi explained that the diagnosis he gave Ream is from the *Diagnostic and Statistical Manual* published by the American Psychiatric Association. *Id.* Dr. Ziccardi also explained that the procedure he followed with Ream is a procedure that is accepted in the psychiatric community.

{¶20} Dr. Ziccardi's diagnosis was that Ream was suffering from a condition known as acute stress disorder. Dr. Ziccardi stated that it is necessary to conduct a two-step analysis to determine whether someone suffers from acute stress disorder. The first step requires that "(1) the person experienced, witnessed or was confronted with an event that involved actual threat and death or serious injury or threat to the physical integrity of self or others[; and (2)] the person's response involved intense fear, helplessness or horror." *Id.* at 19-20. The second step requires a person to have at least three symptoms present. In Ream's case,

Dr. Ziccardi testified that he had symptoms of derealization, dissociative amnesia, and a reduction in awareness of one's surroundings.

{¶21} Further, on cross-examination, Dr. Ziccardi admitted he was unable to determine whether the acute stress disorder Ream exhibited was due to Ream shooting Ron in self-defense or from purposefully shooting his brother. Dr. Ziccardi also admitted that there are no published peer reviewed articles that would allow him to draw that distinction because doctors are unable to "cause trauma to study the reaction to people." *Id*. at 26.

{¶22} The trial court granted the State's Motion in Limine and prohibited the testimony of Dr. Ziccardi at Ream's trial. In its order, the trial court stated that Dr. Ziccardi's methodology was unreliable and his proposed testimony was irrelevant. Specifically, the trial court stated that because Dr. Ziccardi mainly relied on Ream's own "self-reporting" in making his diagnosis, it was not "sufficiently reliable to present to a jury at trial." (Docket No. 223, p. 7). Further, the trial court found that even if the methodology proved to be reliable, it was irrelevant under Evid.R. 402. The trial court noted that Dr. Ziccardi testified that he had no opinion as to the source of the acute stress disorder and cannot determine whether the disorder was caused by Ream acting in self-defense. Therefore, the trial court concluded that Dr. Ziccardi's conclusions cannot be used

to strengthen, or make more probable, the argument that Ream killed his brother in self-defense.

*Motion for New Counsel*

{¶23} On August 7, 2012 a motion hearing was held to determine whether Ream should be given another court appointed attorney. This motion hearing was held six days before Ream's trial began, and this was the first time Ream had complained to the trial court about his trial counsel. When asked why he wanted new trial counsel, Ream replied:

A:   I also I believe [I] told [the trial court] that I haven't been able to see [trial counsel] as much as I'd like to and we needed to cover an awful lot of material. I haven't seen hardly anything. When I do see [trial counsel] it's usually to imply things of plea bargaining and [those] types of issues which I'm not interested in and haven't been and I've tried to tell [trial counsel that]. Okay, that's just one –

Q:   That's that's fine.

A:   One (1) one (1) one (1) of the particulars that will come up. But, based on what I've seen and involving [trial counsel] –

Q:   When – how long as this been going on?

A:   Quite some time.

Q:   I'm sorry?

A:   Quite some time, when I – the times I've have seen –

Q:   And you bring it to the court's attention less than a week before trial?

* * *

-16-

Q: Do you have any information that [trial counsel] hasn't investigated all the facts and knows all the possible defenses in this case?

A: Being that [trial counsel] didn't sit down with me and discuss a lot of pertinent information I was for – [trial counsel] told me don't write him, but because of the lack of communication between [trial counsel] and I, I was forced to write to him letters in the mail which I don't like doing. [Trial counsel] didn't want to receive them but I had no choice but to supply him what information I could through the mail. I received no acknowledgement that [trial counsel] was going to use any of that information.

Pre-Trial/Motion Hearing Tr., p. 3-6.

{¶24} The trial court then proceeded to ask trial counsel questions. Trial counsel explained:

A: I have received the letters from [Ream] and have read them. I have told [Ream] to be very careful what he puts in those letters because of the correctional officers or law enforcement officers. I – it's my belief that they do review the correspondence that go[es] out and I just told him to be very careful and I did not recall anything that really needed to be [in] detail gone over with him. I have sat down and gone over with him – this matter has been going on for sometime [sic] and I cannot sit there everyday [sic] or every other day, every week sittin there ho- providing him with all of the discovery that has been pr-provided to me by the State. I made copies of the audio and video recordings, I made copies of the approp- applicable law in areas that are of interest and of particular relevant [sic] in these cases. I had some more to give [Ream] today too.

Q: Let me ask you this [trial counsel]. Do you feel as far as your representation of the Defendant, James R. Ream, is there any conflict of interest in you representing him?

A: I- Well my discussions with him I have informed [him] that I did know some of the people that are involved in this instance and –

Q: But is there any conflict as far as your representing him to the enth degree?

A: There's no – I D- I have not represented any of the witnesses or anything like that. There's not that type of a conflict. But, if –

Q: That's what I am asking.

A: But, if Mr. Ream feels that I have misrepresented myself to him and he's lost all trust in my representation and he refuses to discuss matters and with me and to review –

Q: Up until today he has done that?

A: One time I think. I can't recall it was four, five, six, seven weeks ago we had a bit of a disagreement and he got upset and walked [a]way, but, we continued the conversation. I thought the matter was resolved.

Q: Alright. Have you always given him an honest appraisal of the case?

A: Yes, I believe I have.

*Id.* at p. 6-8.

{¶25} The trial court then asked the State for its opinion of the trial counsel's representation of Ream. The prosecuting attorney responded as follows:

A: As much as it pains me to admit this and say nice things about [trial counsel], [trial counsel] we've exchanged discovery. [Trial counsel's] made several calls with respect to particular items of of of evidence and exhibits. As a matter of fact [trial counsel] called me yesterday to set up a time when he can physically take a look at all the evidence which we've scheduled for tomorrow morning. We've had communications directly on several occasions and I have – I

think he fully understands the case, he knows the facts of the case. Nothing in [trial counsel's] conduct has led me to believe that he's anything but competent to handle this matter.

*Id*. at 11.

**{¶26}** Trial court then denied Ream's motion for new counsel.

*Motion in Limine to Exclude Prejudicial Photographs*

**{¶27}** On August 9, 2012, Ream filed a Motion in Limine to exclude certain photographs as they were irrelevant and prejudicial. The trial court held a hearing on Ream's Motion in Limine on August 13, 2012, after jury selection, but before the trial began.

**{¶28}** At the hearing, Ream specifically objected to State's Exhibit 84 which was a picture of Ron before he was "cleaned up." Trial Tr., p. 278. Ream argued that the picture was "very bloody" and was not needed. *Id.* at p. 279. Ream also objected to State Exhibits 87, 88, 89, 90, 93, 94, 98, and 99 as cumulative, repetitive, and unnecessary. The trial court denied Ream's motion because it found that the photographs could corroborate the coroner's testimony and were not overly prejudicial. Further, the court found that the photographs were not cumulative in nature.

**{¶29}** Ream also argued that State's Exhibit 2 should be excluded as it was irrelevant and would elicit an emotional response from the jury. Exhibit 2 was a pre-death photograph of Ron. The State argued that the photograph was necessary

to prove that an actual person was killed by Ream and that the jury had a right to see the victim prior to his death. The trial court agreed with the State and denied Ream's motion as to State's Exhibit 2.

{¶30} Further, Ream attempted to exclude State's Exhibits 40, 41, and 42, arguing that they were irrelevant and that any probative value would have been greatly outweighed by its prejudicial effect. Exhibit 40 showed Ron after the shooting on his side; Exhibit 41 was a photograph of a bullet hole in Ron's chest; and Exhibit 42 was an up-close photograph of Ron's torso. The State argued that the three photographs were necessary as it showed the position of the body as police found it, it showed evidence underneath Ron's body, and showed evidence on top of Ron's body. The trial court again ruled that the photographs were relevant and did not prejudice Ream.

*Trial Proceedings*

{¶31} The trial of this matter commenced on August 12, 2012 and ended on August 15, 2012. The State's first witness was Rex Whetstone, Ron's former neighbor and good friend. On direct examination, Whetstone testified that Ron was recently retired and that before his retirement he had suffered from health problems. Specifically, Ron had been diagnosed with prostate cancer and had to have a surgery to remove his cancer. Despite having this surgery, Ron would still golf with Whetstone one to two times a week.

{¶32} Whetstone testified as to Ream's and Ron's relationship over the past six years. According to Whetstone, Ream lived with Ron, and Ream would occasionally mow the yard and do landscaping. But, Ream did not contribute to the household expenses and rarely was able to keep a job while living with Ron. Whetstone further testified that Ron owned two cars and let Ream drive one of them. Whetstone was also able to comment on Ream's spending habits and revealed that Ream spent much of his money on lottery tickets. Whetstone stated that in his six years of knowing the two brothers, he never saw them get in a physical confrontation.

{¶33} Whetstone then testified in regard to events he witnessed on October 17, 2011. Whetstone stated he was having relationship troubles with his significant other and decided to go to Ron's for the night. Around 10:00 p.m., Whetstone arrived at 1240 Fairgreen and noticed that all the lights were off, and the only light coming from the house was from the TV. Whetstone also observed that only Ron's car was in the driveway, and that the car Ream usually drove was not there.

{¶34} As Whetstone approached the door he saw Ron lying on the floor with a blanket on top of him. Whetstone testified that he knocked on the door, but Ron did not wake up. Whetstone did not think this was unusual as Ron was hard of hearing. Whetstone then proceeded to call both Ron's and Ream's cell phones,

but got no answer. Then Whetstone walked to the back of 1240 Fairgreen, hoping the back door would be unlocked. However, the back door was also locked, and Whetstone tried knocking again. Around 10:30 that night, Whetstone decided to leave.

{¶35} On cross-examination, Whetstone testified that after Ron's prostate surgery, Ron experienced discomfort and some pain. Ron also could not complete many of the chores around the house. Ream helped Ron with these chores for the time he was recovering from his surgery. Whetstone also testified that Ream always did the landscaping and yard work for Ron. Further, Whetstone admitted that Ron liked to drink beer and smoke marijuana on a daily basis.

{¶36} The State then called Megan Mays, an employee of a local gas station, to testify. Megan testified that Ream often came to the gas station to buy lottery tickets. According to Megan, she learned that Ream was accused of killing Ron the day after the shooting occurred. Megan thought this was strange, as Ream had come into the gas station the previous evening. Megan testified she left work about 10:10 p.m. on October 17, 2011 and saw Ream come into the station as she was leaving.

{¶37} Deputy Jerry Cress of the Allen County Sheriff's Office was the next witness to testify. Deputy Cress testified that he was on duty on October 18, 2011. Around noon, Deputy Cress was in the parking lot of the Sheriff's Office, placing

some items in his police cruiser when Ream approached him. According to Deputy Cress, Ream asked him if he was on duty and if he had jurisdiction in Shawnee Township. When Deputy Cress replied that he did have jurisdiction, Ream told Deputy Cress to arrest him. Deputy Cress then asked Ream why he needed to be arrested, and Ream told Deputy Cress that "he had got[ten] into a situation that he couldn't get out of and he shot his brother." Trial Tr., p. 367.

{¶38} According to Deputy Cress, Ream's demeanor was calm but upset. Deputy Cress took Ream down to the booking area where he met with his supervisor and spoke with the Shawnee Township Police Department. Ream gave Deputy Cress his keys and gave him verbal permission to enter 1240 Fairgreen. When Deputy Cress arrived at the crime scene, Shawnee Township police officers were already there[2] and told Deputy Cress that they found a deceased body in a bedroom.

{¶39} On cross-examination Deputy Cress admitted that Ream was very cooperative throughout the booking process. Deputy Cress also stated that the officers kept a close eye on Ream because they were unsure of his mental health.

{¶40} Sergeant Gregory Crites of the Allen County Sheriff's Office then testified as to his role in the investigation. Sergeant Crites testified that he was on duty on October 18, 2011. Around noon that day, Sergeant Crites met with

---

[2] Deputy Cress also testified that when the Shawnee Township police officers arrived at 1240 Fairgreen, "there was a set of keys in the front lock" and "based on the information that I had relayed to [the Shawnee Township Police Chief] he made entry to do a wellbeing check." Trial Tr. p. 371.

Deputy Cress and Ream in the holding area. According to Sergeant Crites, Ream admitted to killing his brother, Ron. Sergeant Crites then asked Ream how he had killed his brother, and Ream replied that he had shot him. Sergeant Crites then testified that Ream told him that he shot his brother because "[Ream] had a number of good jobs and [Ream] lost them because [he] was taking care of [his] brother [Ron] because he has – has cancer." Trial Tr., p. 381, Sergeant Crites further indicated that Ream said that "[he] just can't take it anymore." *Id*. at p. 383.

{¶41} Sergeant Fred Depalma of the Allen County Sheriff's Office was the next witness to testify. Sergeant Depalma was called to respond to 1240 Fairgreen and assisted with the scene's processing. Sergeant Depalma took various pictures of the crime scene, which were subsequently offered into evidence. After taking pictures of the crime scene, Sergeant Depalma testified that he examined a recliner chair, which had blood spatters on it but found no bullet holes in the recliner. He then went to the bedroom where Ron's body was located. Sergeant Depalma testified that there were smear patterns on the floor from where the deceased body was dragged to the bedroom. He then testified that he found the body, faced down, with a multicolored blanket over him and a kitchen knife on top of the blanket. Further, Sergeant Depalma stated that he found Ron with cloth material tied around his wrist, and a rope tied around the cloth material.

{¶42} Sergeant Depalma then testified that he collected a total of five shell casings from inside 1240 Fairgreen. Once the coroner arrived on scene, Ron's body was examined further. Sergeant Depalma noticed a bullet hole in Ron's chest and a remote control underneath his body that appeared to have been dragged with the body.

{¶43} Ashley Magrum, Ron's next door neighbor, was the next witness to testify. Magrum testified that around 9:20 p.m., on October 17, 2011, she was outside her house smoking a cigarette. At that time she heard loud, multiple "bangs." Trial Tr., p. 478. Magrum testified that these loud bangs were not in sequence, rather they were in groups. According to Magrum, she heard at least five bangs coming from 1240 Fairgreen. Magrum thought that somebody was working on their house, and at first, did not believe they were gun shots.

{¶44} On cross-examination, Magrum testified that it all happened very quickly, and from hearing the first sound to the last sound was about two minutes. She testified that 60 to 90 seconds elapsed from hearing the first group of shots to the second group of shots. Further, Magrum testified that she does not know for sure whether the noises were gunshots, but assumed that they were.

{¶45} Next to testify was Todd Wharton, a forensic scientist for the Bureau of Criminal Identification and Investigation ("BCI"). Wharton testified that the gun, which Ream handed over to police, was a .45 caliber Smith and Wesson

pistol and was semiautomatic. He explained that when one pulls the trigger of a semiautomatic pistol it will only fire one bullet. Wharton testified that he tested Ream's gun for two purposes: (1) to test the casings and bullets found at the crime scene; and (2) to determine whether Ream's gun was in proper working condition. Wharton testified that Ream's gun worked properly and that the casings and recovered bullets matched his test casings and bullets from Ream's .45 Smith and Wesson pistol.

{¶46} Wharton also testified that he tested casing and bullet fragments that police officers recovered from a fire ring at 1240 Fairgreen. These bullets and casings were damaged after being placed in a fire. Wharton testified that he compared the tested bullets and casings to the damaged bullets and casings discovered in the fire ring and found that there were some matching individual barrel engraved striations, but not enough for a positive identification. Wharton elaborated on how the bullets and casings were damaged. Wharton stated that some of the bullets were missing its core so only the jacket was intact. Further, the jacket was a darker color which is consistent with the bullet being placed in a fire.

{¶47} The next witness to testify was Daniel Davison, another forensic scientist for BCI, who works in the Trace Evidence Section. Davison explained that trace evidence includes, among other things, fiber analysis. When dealing

with fiber analysis, Davison testified that he usually compares a fiber whose origin is unknown to a known fiber to determine whether they match. Davison was given several pieces of wood from the floor of 1240 Fairgreen with unknown fibers attached to it. Davison was also given the shirt Ron was wearing the night of the shooting, to compare the fibers found in the wood. Davison was able to conclude that the synthetic fibers found in the wood, were consistent with the fibers found in the shirt. Further, Davison testified that what he found was consistent with a bullet going through the collar of the shirt and depositing the fiber in the hole of the wood.

{¶48} Detective Baker was the next witness to testify. Detective Baker testified that Ream never stated he sustained injuries on October 17, 2011. Further Detective Baker testified that he read Ream his *Miranda* rights, and Ream chose to waive those rights. Detective Baker played Ream's two police interviews for the jury. The two police interviews produced the following relevant evidence.

{¶49} Throughout the two interviews, Ream criticized Ron, calling him lazy, an ex-con, Dr. Jekyll and Mr. Hyde, and gross. Ream also described Ron as having a violent temper and always picking fights with Ream.

{¶50} Ream described what happened on October 17, 2011. According to Ream, he had an argument with Ron and Ron decided to kick Ream out of 1240 Fairgreen. As Ream was leaving with a pile of his clothes and his gun case, Ron

lunged at Ream with a kitchen knife. Ream stated that after Ron lunged at him, he pulled out the gun from the gun case and shot Ron. Ream mentioned on several occasions that he feared for his life and believed Ron was going to stab him. Throughout the two interviews, Ron mentioned how he "blanked out" and could not remember all of the details surrounding the shooting. Ream then told Detective Baker that he cleaned up the blood on the floor so that the police would not track around blood when they arrived at 1240 Fairgreen. Further, Ream stated that after he shot Ron, Ron started to make gurgling noises so he decided to drag Ron to the bedroom.

{¶51} Ream mentioned that he went to McDonalds around 5 or 6 a.m. on October 18, 2011. Ream contacted his son and daughter that morning, giving them some of his possessions. When asked why Ream did not call 911 immediately after the shooting, Ream replied that he was in shock and assumed the neighbors had already called 911. Ream also told Detective Baker that he has suffered from mental problems and had been admitted to a psychiatric hospital twice before the shooting. Ream never mentioned going to BP the night of October 17, 2011.

{¶52} The next witness to testify for the State was Angie Jenkins, Ron's daughter. Jenkins testified that Ron and Ream had a troubled relationship. Ron financially supported Ream and his gambling habits. Jenkins also testified that the

week Ream shot Ron, Ron had given Ream a $500.00 loan. Jenkins further testified that after Ron had his prostate surgery, it was mainly her and her brother who took care of Ron.

{¶53} Dr. Diane Scala-Barnett, a deputy coroner[3] at the Lucas County Corners' Office, then testified to the wounds Ron received on October 17, 2011. She described seven gunshot wounds in the order in which she examined them, but did not suggest that the wounds occurred in the order she described. She indicated that the first gunshot wound was to the left side of the neck. Dr. Scala-Barnett further testified that there was a downward trajectory for this wound, which would be consistent with the shooter standing and the victim sitting in a chair. The second gunshot wound was to Ron's left chest. The third gunshot wound was to Ron's left flank, while the fourth gunshot wound was to Ron's upper right arm. Dr. Scala-Barnett testified that the fourth gunshot wound was consistent with the victim on the ground and the shooter standing over the body. The fifth gunshot wound was also to the left flank. The sixth gunshot wound entered Ron's back. Dr. Scala-Barnett explained that this gunshot wound was made while the shooter was higher than the victim. Finally, the seventh gunshot wound grazed Ron's neck.

---

[3] Dr. Scala-Barnett testified that she is also a forensic pathologist at the Lucas County Corners' Office.

{¶54} Dr. Scala-Barnett testified that of the seven gunshot wounds, only six were perforating wounds. Of the six perforating wounds, four bullets went through and through, and two bullets were recovered in the body at the autopsy. Further, Dr. Scala-Barnett testified that none of these wounds were a result from close range firing. Therefore, the shooter had to have been, at a minimum, a foot and a half to two feet away from Ron. Dr. Scala-Barnett testified that the Ron's cause of death was multiple gunshot wounds.

{¶55} On cross examination, Dr. Scala-Barnett testified she did a toxicology report on Ron and it revealed that he had therapeutic levels of cold medicine in his system.

{¶56} After Dr. Scala-Barnett's testimony, the trial court received all of the State's exhibits into evidence. The State then rested. Ream moved for an acquittal pursuant to Crim.R. 29, but the trial court denied the motion.

{¶57} Ream offered the knife found on Ron's body into evidence as Exhibit A. Thereafter, the defense rested and Ream renewed his Crim.R. 29 motion for acquittal, which the trial court again denied.

{¶58} Next, Ream objected to the State's proposed jury instructions. Specifically, Ream objected to the absence of the words "even if mistaken" from the Ohio Jury Instructions, CR 421.19 concerning self-defense. Ream also wanted the trial court to include jury instructions of the lesser included offenses of

"manslaughter, negligent homicide, reckless homicide, and voluntary manslaughter." Trial Tr., p. 671. The trial court refused Ream's request to include the words "even if mistaken" to the self-defense jury instruction and also refused to include lesser included offenses because the evidence presented at trial did not support any of these instructions.

{¶59} Both the State and Ream offered their closing statements and the trial court charged the jury before deliberations.

{¶60} On August 15, 2012, the jury returned a guilty verdict on the murder charge and the firearm specification. This matter then proceeded to sentencing on that same day. After hearing evidence and argument relating to the issue of punishment, the trial court imposed the sentence as follows: (1) 15 years to life in prison for the one murder count; and (2) three years in prison for the firearm specification to be run consecutively. As such, the trial court imposed a total prison term of 18 years to life.

{¶61} Ream timely appealed this judgment, presenting the following assignments of error for our review.

### *Assignment of Error No. I*

**THE TRIAL COURT ERRED IN FAILING TO SUPPRESS STATEMENTS MADE DURING POLICE INTERVIEWS, AS THE DEFENDANT INVOKED HIS FIFTH AMENDMENT RIGHT TO COUNSEL.**

*Assignment of Error No. II*

**THE TRIAL COURT ERRED IN DISALLOWING THE TESTIMONY OF THE DEFENSE'S EXPERT WITNESS.**

*Assignment of Error No. III*

**THE TRIAL COURT ERRED IN NOT GIVING JURY INSTRUCTIONS REQUESTED BY THE DEFENDANT.**

*Assignment of Error No. IV*

**THE TRIAL COURT ERRED IN NOT GRANTING THE DEFENDANT'S MOTION FOR NEW COUNSEL.**

*Assignment of Error No. V*

**THE DEFENDANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL.**

*Assignment of Error No. VI*

**THE TRIAL COURT ERRED IN PERMITTING THE INTRODUCTION OF GRUESOME PHOTOGRAPHS.**

**{¶62}** Due to the nature of the assignments of error, we elect to address them out of order.

*Assignment of Error No. I*

**{¶63}** In his first assignment of error, Ream argues that the trial court erred by failing to suppress his statements made during the police interviews. Specifically, he asserts that the statements were inadmissible because he invoked

his Fifth Amendment right to counsel during the course of the interviews.[4] We disagree.

*Standard of Review*

**{¶64}** "Appellate review of a decision on a motion to suppress presents a mixed question of law and fact." *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8. The trial court serves as the trier of fact and is the primary judge of the credibility of the witnesses and the weight to be given to the evidence presented. *State v. Johnson*, 137 Ohio App.3d 847, 850 (12th Dist. 2000). Therefore, when an appellate court reviews a trial court's ruling on a motion to suppress, it must accept the trial court's findings of fact so long as they are supported by competent, credible evidence. *State v. Roberts*, 110 Ohio St.3d 71, 2006-Ohio-3665, ¶ 100. The appellate court must then review the application of the law to the facts de novo. *Burnside* at ¶ 8.

Miranda*'s Protections*

**{¶65}** The Fifth Amendment to the United States Constitution provides that "[n]o person * * * shall be compelled in any criminal case to be a witness against himself * * *." This provision is applicable to the states via the due process clause of the Fourteenth Amendment. *Malloy v. Hogan*, 378 U.S. 1, 6, 84 S.Ct. 1489 (1964). The United States Supreme Court has interpreted the Fifth Amendment as

---

[4] In Ream's Motion to Suppress, Ream also argued he was unable to properly waive his Fifth Amendment right to counsel because of his diminished mental capacity during the two interviews. However, he does not raise this issue on appeal; therefore, we will not discuss its merit.

bestowing certain rights upon criminal suspects that are subject to custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436, 478-79, 86 S.Ct. 1602 (1966). These rights include the right to remain silent and the right to have counsel present during the interrogation. *Id.* Once a suspect invokes these rights during an interrogation, all further questioning "must cease and may not be resumed in the absence of counsel unless the [suspect] thereafter [executes] a valid waiver or himself renews communication with police." *State v. Knuckles*, 65 Ohio St.3d 494 (1992), paragraph one of the syllabus. This rule applies even where the suspect executed a *Miranda* waiver before invoking his right to counsel. *Edwards v. Arizona*, 451 U.S. 477, 484-85, 101 S.Ct. 1880 (1981).

**{¶66}** A merely "ambiguous or equivocal" invocation of the right to counsel does not dictate that police officers halt their questioning. *Davis v. United States*, 512 U.S. 452, 459, 114 S.Ct. 2350 (1994). As a result, Ohio courts have found that the following statements are insufficient to invoke the right to counsel:

(1) "[W]hen I talk to my lawyer," *State v. Jackson*, 107 Ohio St.3d 300, 2006-Ohio-1, ¶ 95;

(2) "[D]on't [sic] I supposed to have a lawyer present[?]" *State v. Brown*, 100 Ohio St.3d 51, 2003-Ohio-5059, ¶ 19;

(3) "I think I need a lawyer," *State v. Henness*, 79 Ohio St.3d 53, 62 (1997);

(4) "I would prefer a lawyer but I want to talk to you now," *State v. Carr*,
1st Dist. Hamilton No. C-090109, 2010-Ohio-2764, ¶ 18; and

(5) "Well, I'm going to need [an attorney]," *State v. Tefft*, 3d Dist. Allen
No. 1-99-35 (Sept. 2, 1999).

*See also State v. Ward*, 3d Dist. Marion No. 9-99-39 (Dec. 2, 1999) (collecting cases). Rather, for a proper invocation of rights, "the suspect must unambiguously request counsel." *Davis* at 259. This means that a suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id.* As suggested by the plain terms of the test, this inquiry is objective and does not rely on the subjective beliefs of the defendant or the interrogating officers. *State v. Hatten*, 186 Ohio App.3d 286, 2010-Ohio-499, ¶ 57 (2d Dist.).

{¶67} Here, Ream argues that he invoked his right to counsel in both of the police interviews conducted on October 18, 2012 and October 20, 2012. In regard to the October 18, 2012 police interview, Ream stated that "I can give you some basics but I do need a public defender to tell me what I should be saying, what I shouldn't." (State's Exhibit 82). Detective Mark Baker then asked Ream to read the waiver of rights form and sign it. Later in the interview Ream stated, "get a public defender in here with me so he can tell me what I am allowed to tell you * *

* that ain't right, I flipped out on him, I sat there for hours not realizing [I shot him]." (*Id.*).

{¶68} In regard to the October 20, 2011 interview, Ream argues that he also invoked his right to counsel. The following conversation took place once the interview began.

> Ream: They're gonna have to provide me with some counsel. I'll be happy to talk to you and fill in the gaps, but right now I'm still trying to remember what the gaps are.
>
> Baker: You are in custody and I do have to read you your rights and we will talk about them. The reason I brought you up today because the prosecutor called me * * * they have, obviously, completed the process of the crime scene * * * there are some questions about certain things that happened based on what you told me yesterday.
>
> Ream: You know what, I'm still drawing blanks.
>
> Baker: Let me ask you this question. I don't want to get into it, without being legal. It is for your protection. If I go over the waiver of rights form with you and go through that process like we did on day one, when we first sat down, can we talk about some of the things that happened?
>
> Ream: I'll tell you this. Let's rehash the last two weeks.
>
> Baker: Ok we can do that. Let's do this [pointing to waiver] then we'll do that. * * * I don't want you to go through anything without acknowledging that [referring to the waiver].
>
> [Detective Baker reads the waiver out loud for Ream].
>
> Ream: Before I sign this, I am more than willing to cooperate, I need to have whoever they assigned [to] me present for any pertinent questions.

> Baker: That's fair. We can do this, if you want to talk about certain things, that's fine with me.
>
> Ream: I'm gonna help you piece together what led up to all this. That I can do and I know I am in the clear.
>
> Baker: Let me cover my butt here. If you don't want to talk to me without a lawyer we don't have to talk at all.
>
> Ream: Well I can say things up to the incident but I'm still trying to figure out how the incident got started to be honest with you.
>
> Baker: If we come across something that you want to talk to me and we come across something that you don't want to talk about, we don't have to.
>
> * * *
>
> Ream: We'll go ahead and I will sign these papers for you. And we'll start from a couple of weeks ago, and I will tell you what led up to that point, but I am not going to answer anything that I don't know what to tell you.

(*Id.*). About 50 minutes into the October 20, 2012 interview, Detective Baker once again becomes confused as to whether Ream is asking for his attorney and they have the following exchange.

> Baker: Let me ask you something here. This isn't even about your case, it ain't about what you did. A couple of times now you've brought up the fact, let me talk to the, whoever my public defender will be, do you think your public defender, is it because you don't want to talk to me about it without counsel? If that's the case, all you have to do it tell me that. Or do you think that, in your mind, that talking to the public defender is gonna help you remember some things. I am confused now.
>
> Ream: No. So he can tell me what I am allowed to say.

-37-

Baker: Are you afraid to tell me some things? Is that it?

Ream: You know what, I can't remember a lot of what actually took place right there, because my mind was going about 15 different directions before that happened, trying to remember what I couldn't take what I needed to do before. And out of the blue, he got really, I mean he just he was almost like the devil came over him or something you know, that's what I remember * * *.

Baker: You talk a lot and I listen * * * I don't want to sit here and I'm not gonna play a tricking game with you. When I read you your *Miranda* rights, it's for a reason, and I have to abide by it. If you don't, I have some questions that pertain directly to –

Ream: I don't trust me.

* * *

Baker: I guess in my world, most of the time anyway, things are black and white. A guy either wants to talk to me or he doesn't.

Ream: I want to, I just can't.

Baker: Or you feel like legally you don't want to talk to me because you want to talk to your attorney.

Ream: Well that's part of it, that's part of it. But the part of it, is I'm blanked out * * *.

Baker: I just kinda wanna distinguish which one of the two it is. Because, *if it's Rick legally James R. Ream wants to not talk to me because he wants his attorney, I want to leave the room.*

Ream: *No, that's not it.* Look I know you are a good guy ok I know what your position is here. *I wanna fill in the gaps, I wanna clarify that right here and now.* But I can't remember exactly what took place other than him lunging * * *.

Baker: I would never be upset with you, I would never be mad, I would never call you a a a liar or a deceiver for the simple fact you

can't remember what happened because so much happened. Like I said, I am just trying to distinguish between whether or not you wanna talk to me about it, about what you can remember, and the gaps you can fill in or if you just don't want to. That's what I am trying to get at.

Ream: The only reason I said that about the legal counsel, is because I think having a mediator here, okay, will help out a little bit. That's what I am saying.

Baker: I am not pressuring you or anything.

Ream: No you're not. No no no no please don't put that on yourself.

Baker: I am not trying to make you talk about anything you don't want to talk about.

(Emphasis added.) (*Id.*).

**{¶69}** Ream never clearly and unequivocally invoked his Fifth Amendment right to counsel during either interview. Although Ream asked that counsel be present for any questions concerning events that he did not remember, he nevertheless made it clear he wanted to talk to Detective Baker about the events leading up to the shooting, and the events which he could remember. After hearing this statement, Detective Baker went out of his way to determine whether Ream was attempting to invoke his right to counsel. Further, Detective Baker told Ream numerous times that they did not have to talk and he even told Ream that he would leave the interview room right away if Ream no longer wished to speak him. In response, Ream said that he wanted to continue the interview with him.

{¶70} Even if Ream's statements are construed as invoking his right to counsel, we would still find no *Miranda* violation in this matter. After discussing the possibility of obtaining a public defender, Ream immediately renewed communication with Detective Baker and freely discussed the shooting. These voluntary statements removed any potential constitutional infirmity from the interrogation since Ream himself instigated the discussion. *See State v. Williams*, 6 Ohio St.3d 281, 290 (1983) ("Once an accused * * * invokes his right to counsel, all further custodial interrogation must cease and may not be resumed in the absence of counsel unless the accused thereafter effects a valid * * * waiver of his right to counsel or himself renews communication with the police.").

{¶71} Accordingly, we overrule Ream's first assignment of error.

### *Assignment of Error No. II*

{¶72} In his second assignment of error, Ream contends that the trial court erred by excluding testimony from his expert witness, Dr. Matthew Ziccardi. We disagree.

{¶73} The admissibility of expert testimony is a matter committed to the sound discretion of the trial court, and the trial court's ruling will not be overturned absent an abuse of that discretion. *Valentine v. Conrad*, 110 Ohio St.3d 42, 2006-Ohio-3561, ¶ 9. A trial court will be found to have abused its discretion when its decision is contrary to law, unreasonable, not supported by the

evidence, or grossly unsound. *State v. Boles*, 2d Dist. Montgomery No. 23037, 2010-Ohio-278, ¶ 16-18. When applying the abuse of discretion standard, a reviewing court may not simply substitute its judgment for that of the trial court. *State v. Slappey*, 3d Dist. Marion No. 9-12-58, 2013-Ohio-1939, ¶ 12.

{¶74} When assessing the admissibility of expert testimony, the threshold question to determine is whether the testimony was relevant under Evid.R. 401. Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. These provisions produce a low threshold of admissibility, which "reflect[s] the policy favoring the admission of relevant evidence for the trier of fact to weigh." *State v. Kehoe*, 133 Ohio App.3d 591, 606 (12th Dist. 1999).

{¶75} If the testimony satisfies the threshold determination of relevancy, our inquiry transitions to the dictates of Evid.R. 702, which provides as follows:

{¶76} A witness may testify as an expert if all of the following apply:

> (A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;
> (B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;
> (C) The witness' testimony is based on reliable scientific, technical, or other specialized information. To the extent that the testimony

> reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:
> (1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;
> (2) The design of the procedure, test, or experiment reliably implements the theory;
> (3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result.

When performing this analysis, we are mindful that "courts should favor the admissibility of expert testimony whenever it is relevant and the criteria of Evid.R. 702 are met." *State v. Nemeth*, 82 Ohio St.3d 202, 207 (1998). "Furthermore, even if the exclusion of the evidence were error, reversal is warranted only on a showing of prejudice to the accused." *State v. Layton*, 6th Dist. Lucas No. L-90-345 (Feb. 28, 1992).

*Relevance of Dr. Ziccardi's Expert Opinion*

{¶77} Dr. Ziccardi's proposed testimony exclusively focused on Ream's behavior after the shooting. It was his expert opinion that Ream was in a state of shock and suffered from dissociative amnesia after shooting his brother. According to Ream, this opinion would have explained why he acted in an illogical manner by waiting 15 hours to inform the police and going to a BP gas station and McDonalds after the shooting. He also claims it would have assisted the defense in explaining why Ream could not remember exact details after the shooting during his two interviews with Detective Baker.

{¶78} The trial court found that Dr. Ziccardi's testimony was not relevant because he could not testify as to whether Ream intentionally killed Ron or acted in self-defense. In doing so, it explained that Ream's behavior after the shooting was irrelevant to this matter. We find that the trial court erred in this regard.

{¶79} Dr. Ziccardi's expert opinion was relevant because it rebutted the State's arguments that Ream's post-shooting behavior suggested that he had not acted in self-defense when he shot Ron. The State mentioned Ream's post-shooting behavior five separate times in its opening statement and ten times during its closing argument. Specifically, the State argued in its closing statement that "I do want to highlight a couple of things that go right to the essence of [Ream's] defense[.] * * * Common sense would tell us that [Ream] would have called 911 when he shot his brother * * *." Trial Tr., p. 689-90. Further, the State argued, "[n]ot calling 911. Watching your brother die and do[ing] nothing. Destroying evidence. And waiting fifteen (15) hours to report, folks. It just isn't self-defense." *Id*. at 728. Moreover, the State called Mays during its case-in-chief for the sole purpose of eliciting testimony regarding Ream's post-shooting trip to a BP Station.

{¶80} Since the State extensively focused on Ream's post-shooting behavior in fashioning its arguments, Ream should have had the opportunity to

rebut this argument with Dr. Ziccardi's expert testimony.[5] By finding that it was irrelevant and excluding it on that basis, the trial court erred.

*Reliability of Dr. Ziccardi's Expert Opinion*

{¶81} Our determination that Dr. Ziccardi's proposed testimony was relevant does not end our inquiry, as we must now turn to the testimony's admissibility under Evid.R. 702. In determining whether the opinion of an expert witness is reliable under Evid.R. 702(C), a trial court, acting as a gatekeeper, examines whether the expert's conclusion is based on scientifically valid principles and methods. *Valentine*, 110 Ohio St.3d 42, 2006-Ohio-3561, at ¶ 16, citing *Miller v. Bike Athletic Co.*, 80 Ohio St.3d 607 (1998). "In evaluating the reliability of scientific evidence, several factors are to be considered: (1) whether the theory or technique has been tested, (2) whether it has been subject to peer review, (3) whether there is a known or potential rate of error, and (4) whether the methodology has gained general acceptance." *Miller* at 611, citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 593-94, 113 St. Ct. 2786 (1993).

{¶82} Although these factors may aid in determining reliability, none of the factors are dispositive as the inquiry is flexible. *Id.*, citing *Daubert* at 594.

---

[5] We note that during Ream's opening and closing statements, his counsel argued that Ream was in a state of "shock" which is why he cleaned up the house. Trial Tr., p. 299, 696. Further, in Ream's interviews with Detective Baker, he stated he did not call the police right away because he was in a state of shock. Therefore, this issue was addressed even without Dr. Ziccardi's testimony.

Ultimately, the focus is "solely on principles and methodology, not on the conclusions that they generate." *Id.*, quoting *Daubert* at 595. The proponent of the expert testimony has the burden to prove the admissibility of the testimony under Evid.R. 702. *See State v. Robinson*, 160 Ohio App.3d 802, 2005-Ohio-2280, ¶ 31 (5th Dist.) ("Scientific evidence is not admissible under Evid.R. 702 unless the proponent of the evidence lays a proper foundation by presenting adequate expert testimony concerning the reliability of the specific procedures used and the underlying scientific principles or theories."), *abrogated on other grounds by State v. Boczar*, 113 Ohio St.3d 148, 2007-Ohio-1251.

**{¶83}** At the *Daubert* Hearing, Dr. Ziccardi explained that the procedure he used to evaluate and diagnose Ream was "generally the accepted methodology and technique in the psychiatric field." *Daubert* Hearing Tr., p. 8. Dr. Ziccardi also stated that his report, dated July 5, was "based on valid scientific methodology and procedures accepted by the psychiatric community and profession." *Id.* at 13. However, on cross-examination, Dr. Ziccardi admitted that there are no peer reviewed articles which would allow a psychologist to determine what caused the trauma when diagnosing someone with acute stress disorder. At the *Daubert* Hearing, there was no testimony elicited that talked about whether the technique Dr. Ziccardi used has been tested or whether there is a known or potential rate of error.

{¶84} In finding that Dr. Ziccardi's proposed testimony was unreliable, the trial court overly focused on the fact that Dr. Ziccardi's opinion derived from Ream's own self-reporting. It is reasonable to expect medical professionals to rely on self-reported patient histories. *See Walker v. Soo Line R.R. Co.,* 208 F.3d 581, 586 (7th Cir. 2000); *see also Cooper v. Carl A. Nelson & Co.*, 211 F.3d 1008, 1019-21 (7th Cir. 2000). "Such histories provide information upon which physicians may, and at times must, rely in their diagnostic work. Of course, it is certainly possible that self-reported histories may be inaccurate." *Walker* at 586. However, when a medical expert has relied upon a patient's own self-reporting, which is found to be inaccurate, a court should allow these inaccuracies to be examined through cross-examination. *Id.* Indeed, in *Daubert,* the Supreme Court "explained that the factual underpinnings of expert testimony may be subject to counter-attack." *Id.*; *see Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

{¶85} Nevertheless, Ream had the burden to prove that Dr. Ziccardi's opinion was reliable. In attempting to carry this burden, Ream only elicited testimony from Dr. Ziccardi that his methodology is widely accepted in the psychiatric community. Ream failed to address any of the other factors listed in

*Daubert*. Even on appeal, Ream has failed to list any factors which would demonstrate that Dr. Ziccardi's opinion was reliable.[6]

{¶86} Since there was a lack of testimony on the reliability of Dr. Ziccardi's methodology, the trial court only had two factors to weigh: (1) the absence of peer reviewed articles; and (2) Dr. Ziccardi's methodology has gained general acceptance in the psychiatric community. One factor weighs in favor of the State, while the other factor weighs in favor of Ream. We are unable to say that the trial court abused its discretion in weighing these factors and determining that Ream did not meet his burden. As a result, we cannot find that the trial court erred in finding that Dr. Ziccardi's opinion was unreliable.

{¶87} Further, even if Dr. Ziccardi's methodology was found to be reliable, Ream, on appeal, failed to state how he was prejudiced by the trial court's decision to exclude Dr. Ziccardi's testimony. Ream merely mentions how Dr. Ziccardi's testimony would have been used to "counteract the [S]tate's assertion that [Ream's] actions were somehow nefarious." Appellant's Br., p. 10. As such, he has offered no argument, and we are unable to find evidence in the record, suggesting that the exclusion of Dr. Ziccardi's testimony somehow reduced the

---

[6] We note that Ream does not cite to the record in support of his argument. Such a failure is violative of App. R. 16(A)(7), which requires an appellant to provide "[a]n argument containing the contentions of the appellant * * * and the reasons in support of the contentions, with citations to the * * * parts of the record on which appellant relies." Although App.R. 12(A)(2) gives us the authority to disregard this deficient assignment of error, we have decided to address its merits in the interests of justice. *See State v. Galbraith*, 3d Dist. Marion No. 9-11-61, 2012-Ohio-5231, ¶ 15.

import of the other overwhelming evidence that supported Ream's conviction or affected the outcome of the trial.

**{¶88}** In sum, we find that the trial court improperly determined that Dr. Ziccardi's testimony was irrelevant. However, we still find no reversible error since we find no abuse of discretion by the trial court in excluding it as unreliable under Evid.R. 702(C).

**{¶89}** Accordingly, we overrule Ream's second assignment of error.

### *Assignment of Error No. IV*

**{¶90}** In his fourth assignment of error, Ream argues that the trial court erred by denying his motion for new counsel. Specifically, Ream contends that the trial court should have granted his request for new trial counsel merely because he had lost confidence in his counsel. Further, he asserts that his trial counsel talked to him about plea bargaining, which Ream was not interested in and also told Ream not to write him letters discussing the case. We disagree.

### *Standard of Review*

**{¶91}** Substitution of counsel is within the discretion of the trial court. *Wheat v. U.S.*, 486 U.S. 153 (1988); *State v. Jones*, 91 Ohio St.3d 335, 343-44 (2001). Therefore, we review the trial court's decision under the abuse of discretion standard. *State v. Murphy*, 91 Ohio St.3d 516, 523 (2001).

**{¶92}** The Sixth Amendment guarantees indigent criminal defendants the right to competent counsel; however, this constitutional right does not extend to a right to counsel of the defendant's choosing. *Thurston v. Maxwell*, 3 Ohio St.2d 92, 93 (1965). Further, the right to counsel does not include a right to a meaningful or peaceful relationship between the counsel and the defendant. *State v. Blankenship*, 102 Ohio App.3d 534, 558 (12th Dist. 1995), citing *Morris v. Slappy*, 461 U.S. 1, 13, 103 S.Ct. 1610 (1983). As such, an indigent criminal defendant may only discharge a court-appointed attorney "upon a showing of good cause, such as a conflict of interest, a complete break-down in the attorney-client relationship or an irreconcilable conflict which leads to an apparently unjust result." *Blakenship* at 558; *see also State v. McCoy,* 2nd Dist. Greene No. 2003-CA-27, 2004-Ohio-266; *State v. White*, 3d Dist. Marion No. 9-98-52 (Aug. 18, 1999).

**{¶93}** Ream had many opportunities to discuss his problems with his trial counsel to the trial court long before his trial, but failed to at every opportunity. For instance, at a pre-trial hearing held on April 6, 2012, the trial court had the following exchange with Ream.

> Q: Very well and you have had suff- have you had an opportunities [sic] to talk with your attorney?
>
> A: As much as he can afford his time, ya. I I would of course like to see him more than what I have been but you know that's – he's probably has other clients. I just met one (1) out in the hallway so.

Final Pre-Trial Hearing Tr., p. 11.

{¶94} Again, at another pre-trial hearing, held on May 18, 2012, the trial

court and Ream had the following exchange.

> Q:   Alright that be [sic] continuing so make sure that they understand that downstairs, okay. And [trial counsel] has been a- in to in to see you at different times?
>
> A:   Yes sir he has.
>
> Q:   Very well, anything else to be brought to the court's attention?
>
> A:   No sir.

Final Pre-Trial Tr., p. 5-6.

{¶95} It was not until August 7, 2012, six days before the trial date, that

Ream informed the trial court that he was having problems with his trial counsel.

Ream claimed that his trial counsel was not visiting him enough, discussed issues

of plea bargaining, and also told Ream not to write him letters concerning the case.

Trial counsel responded by stating:

> A:   I have received the letters from [Ream] and have read them. I have told him to be very careful what he puts in those letters because of the correctional officers or law enforcement officers. I – it's my belief that they do review the correspondence that go[es] out and I just told him to be very careful and I did not recall anything that really need to be [in] detail gone over with him. I have sat down and gone over with him – this matter has been going on for sometime [sic] I cannot sit there everyday [sic] or every other day, every week sittin there ho- providing him with all the discovery that has been pr- provided to me by the [S]tate. I made copies of the audio and video recordings, I made copies of the approp- of the applicable law in

-50-

areas that are of interest and of particular relevant [sic] in these cases. I had some more to give him today.

Pre-Trial/Motion Hearing Tr., p. 6-7.

{¶96} The record indicates that the Appellant and trial counsel had no conflict of interest which would warrant the appointment of a new attorney. Further, the fact that Ream had lost confidence in his trial counsel and wanted to meet with him more, does not amount to a complete breakdown of the attorney client relationship or an irreconcilable conflict. In *State v. Kirk*, 3d Dist. Union No. 14-06-28, 2007-Ohio-1228, the defendant and his trial counsel had a breakdown of communication, where the defendant refused to assist in preparing for a defense in his upcoming trial. *Kirk* at ¶ 21. However, the trial court refused to appoint the defendant a new trial counsel and the defendant appealed to this court. *Id*. at ¶ 16, 32. In affirming the trial court's decision not to grant the defendant new counsel, this court stated there was "a breakdown in communication between [the defendant] and his counsel * * *. However, we cannot find the trial court's refusal to appoint new counsel was unreasonable, arbitrary, or unconscionable * * *." *Id.* at ¶ 59.

{¶97} Here, trial counsel testified he met with Ream over the eight months he spent preparing for Ream's trial. Trial counsel also testified that he provided Ream with the State's discovery and also applicable case law that pertained to Ream's case. Further, Ream's trial counsel testified that he did not want Ream to

write him letters from jail because he was afraid that the correctional officers would seize the letters which could endanger the confidentiality of their relationship. Based on these facts, we find that the trial court did not abuse its discretion by denying Ream's motion for new counsel.

{¶98} Accordingly, Ream's fourth assignment of error is overruled.

### *Assignment of Error No. VI*

{¶99} In his sixth assignment of error, Ream argues that the trial court erred in permitting the introduction of gruesome and prejudicial photographs at trial. We disagree.

{¶100} We preliminarily note that Ream has failed to indicate what specific photographs constitute "gruesome and prejudicial photographs" in his appellate brief. Not knowing what exhibits Ream is objecting to, we are forced to look at all 92 of the photographs the State offered as exhibits, paying closer attention to the photographs that were objected to at the trial level. We find that none of the photographs prejudiced Ream.

### *Standard of Review*

{¶101} "Under Evid.R. 403 * * *, the admission of photographs is left to the sound discretion of the trial court." *State v. Maurer*, 15 Ohio St.3d 239, 264 (1984). A trial court may reject a photograph, otherwise admissible, due to its inflammatory nature, if the prejudicial effect outweighs its probative value.

Evid.R. 403; *Maurer* at 264-65. However, "the mere fact that [a photograph] is gruesome or horrendous is not sufficient to render it inadmissible if the trial court, in the exercise of its discretion, feels that it would prove useful to the jury." *State v. Woodards*, 6 Ohio St.2d 14, 25 (1966). The trial court has broad discretion of the admission of relevant evidence, and unless the trial court has clearly abused its discretion, a reviewing court should be "slow to interfere." *State v. Hymore*, 9 Ohio St.2d 122, 128 (1967).

*Challenged Photographs*

{¶102} On appeal, Ream argues that any admission of a bloody picture of Ron, and any picture taken before the cleaning of Ron's body at the autopsy should have been excluded because they were not relevant. Further, Ream also argues that the picture of Ron before his death, also known as State's Exhibit 2, was erroneously admitted into evidence because it was not relevant and was only offered into evidence to arouse the passions of the jury. Although we find the admission of 92 photographs excessive, we disagree with Ream's contentions.

{¶103} As to Exhibit 2, the picture of Ron before he was deceased, the trial court ruled that this photograph was admissible to show Ron as a living person before the shooting. It is well settled that pre-death photographs of victims are admissible. *See State v. Davie*, 80 Ohio St.3d 311 (1997) (finding that pre-death photos of the two murder victims were relevant and probative for identification

purposes); *State v. Roe*, 41 Ohio St.3d 18, 22-23 (1989) (holding that two pre-death photographs were "clearly relevant for identification purposes"); *State v. Hannah*, 2d Dist. Montgomery No. 19208, 2003-Ohio-5525 (holding that the trial court's admission of a pre-death photograph of the victim was not an abuse of discretion). Therefore, we cannot say that the trial court abused its discretion by admitting one pre-death photograph of Ron into evidence.

**{¶104}** The photographs concerning the crime scene and the bloody pictures of Ron are somewhat gruesome; however, they accurately depict the crime scene and the state of Ron's body after he was shot seven times. The State needed to prove, beyond a reasonable doubt, that Ream purposefully meant to kill Ron. The photographs depicting Ron's wounds are relevant since the number of gunshots and the entry of the gunshots are probative as to Ream's state of mind in shooting Ron. *See State v. Strodes*, 48 Ohio St.2d 113, 116 (1976) ("The State must prove, and the jury must find, that the killing was purposely done. The number of shots fired, the places where the bullets entered the body, and the resulting wounds are all probative evidence of a purpose to cause death."), *vacated in part on other grounds*, 438 U.S. 911, 98 S.Ct. 3135 (1978). Further, the bloody pictures of Ron at the crime scene are also relevant because it showed how his body had been dragged from the living room where he was shot, to the bedroom where police officers found the body, which suggests that Ream attempted to

cover up his actions. Because the pictures were highly relevant, we are unable to find that their introduction was unfairly prejudicial to Ream.

{¶105} Accordingly, we overrule Ream's sixth assignment of error.

### Assignment of Error No. III

{¶106} In his third assignment of error, Ream asserts that the trial court erred by denying his request for jury instructions. Specifically, Ream argues that the trial court erred by refusing to give jury instructions on the lesser included offenses and also by omitting the words "even if mistaken" from the self-defense jury instructions. We disagree.

### Standard of Review

{¶107} Jury instructions are within the sound discretion of the trial court and will not be disturbed on appeal unless an abuse of discretion is shown. *State v. Orians,* 179 Ohio App.3d 701, 2008-Ohio-6185, ¶ 10 (3d Dist.). Therefore, "when reviewing a trial court's jury instructions, the proper review for an appellate court is whether the trial court's refusal to give a requested jury instruction constituted an abuse of discretion under the facts and circumstances of the case." *State v. Dailey*, 3d Dist. Hancock No. 5-99-56 (May 9, 2000); *see also State v. Wolons*, 44 Ohio St.3d 64, 68 (1989).

*Jury Instructions – Lesser Included Offenses*

**{¶108}** In regard to the trial court's failure to give the jury instructions concerning lesser included offenses, we find that Ream's argument lacks merit. Ream contends that the trial court should have included jury instructions for the lesser included offenses of voluntary manslaughter, reckless homicide, and negligent homicide. However, the trial court denied this request and instructed the jury on self-defense. Self-defense is a " 'complete defense to all substantive elements of the crime charged' (or, consequently, to any lesser included offense)." *State v. Shadd*, 3d Dist. Marion No. 9-94-5 (Jun. 15, 1994) quoting *State v. Nolton*, 19 Ohio St.2d 133, 135 (1969). In *State v. Briggs*, 3d Dist. Allen No. 1-06-27, 2006-Ohio-5144, we found that a defendant who asserts self-defense "is not entitled under Ohio law to instructions on self-defense and lesser included offenses, but must choose between the two." (Internal quotations omitted.) *Id*. at ¶ 11.

**{¶109}** Ream argued numerous times that he acted in self-defense. During opening statements, Ream's trial counsel stated:

> What you're going to hear is an altercation between James and Ronald. You're going to hear a story that no matter what happened there was going to be one dead Ream. If James would not have done what he did he would be the one that would be deceased and Ronald would be the one sitting over there right now.
> You're going to hear what took place that evening, an altercation that the younger Ronald Ream went after James, his younger brother, with a knife and threatened him. It was not the first

time he'd ever threatened him. Not the first time he threatened James or other individuals. It was not the first time he ever assaulted James or – he had a prior history of that.

Trial Tr., p. 297. Since Ream argued at trial that he acted in self-defense when he shot Ron, the trial court did not err in denying Ream's request for jury instructions for lesser included offenses.

*Jury Instructions – Self-defense*

{¶110} As to the trial court's failure to include "even if mistaken" as suggested by the Ohio Jury Instructions, we likewise find no error under the facts of this case. In considering this argument, we note that the Ohio Jury Instructions are not mandatory. "Rather, they are recommended instructions * * *. Requiring a trial court to rigidly follow these instructions would remove judicial discretion and control from the trial proceedings and not allow the flexibility necessary to manage the various situations that arise during a jury trial." *State v. Martens*, 90 Ohio App.3d 338, 343 (3d Dist. 1993).

{¶111} The trial court found that there was no evidence presented at trial that Ream's belief that his life was in danger was mistaken. Upon review of the record, we find that the trial court did not abuse its discretion in excluding the words "even if mistaken" from the self-defense jury instructions. During Ream's two interrogations he consistently stated that Ron lunged at him with a knife. Further, Ream offered the knife into evidence as Exhibit A. There was no

evidence presented at trial which showed that Ream was mistaken in his belief that Ron was trying to harm Ream.

{¶112} Accordingly, we overrule Ream's third assignment of error.

### *Assignment of Error No. V*

{¶113} In his fifth assignment of error, Ream argues that his counsel was ineffective because he presented no witnesses at trial. Specifically, he claims that his trial counsel was ineffective for not calling any witnesses in his case-in-chief and failing to retain an expert witness who could testify regarding the self-defense issue. We disagree.

### *Ineffective Assistance of Counsel Standard*

{¶114} An ineffective assistance of counsel claim requires proof that trial counsel's performance fell below objective standards of reasonable representation and that the defendant was prejudiced as a result. *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraph two of the syllabus. To show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, but for counsel's errors, the outcome at trial would have been different. *Id.* at paragraph three of the syllabus. "Reasonable probability" is a probability sufficient to undermine confidence in the outcome of the trial. *State v. Waddy*, 63 Ohio St.3d 424, 433 (1992), *superseded by constitutional amendment on other grounds as recognized by State v. Smith*, 80

Ohio St.3d 89, 103, 1997-Ohio-355. In assessing trial counsel's performance, we must consider "the totality of the circumstances and not isolated instances of an allegedly deficient performance." *State v. Wilson*, 3d Dist. Allen No. 1-09-53, 2010-Ohio-2947, ¶ 12.

*Trial Counsel's Performance*

**{¶115}** After reviewing the evidence in this case, we believe the decision not to call any witnesses in this matter was a reasonable trial strategy and does not provide grounds for a finding of ineffective assistance of counsel. *See State v. Utz*, 3d Dist. Crawford No. 3-03-38, 2004-Ohio-2357, ¶ 12 ("The decision whether to call or not call witnesses is generally a matter of trial strategy and, absent a showing of prejudice, does not deprive a defendant of effective assistance of counsel."); *State v. Newsome*, 3d Dist. Putnam No. 12-12-03, 2012-Ohio-6119, ¶ 50 ("Debatable trial tactics, without more, will not be grounds for a claim of ineffective assistance of counsel."); *State v. Wells*, 11th Dist. Ashtabula No. 2011-A-0073, 2012-Ohio-4459, ¶ 92 ("Strategic and tactical decisions fall squarely within the scope of professionally reasonable judgment."). Further, Ream's trial counsel did secure an expert witness to testify on Ream's behalf. However, the State filed a motion to suppress the expert's testimony, which the trial court granted. Moreover, Ream has failed to provide a list of any witnesses who his trial counsel should have called at his trial and the potential contents of their

testimony. As such, Ream has failed to explain why his trial counsel's failure to call any witnesses prejudiced him.

{¶116} Looking at the record as a whole, it is clear that Ream's trial counsel advocated competently for his client. The record shows that Ream's trial counsel filed a motion to suppress statements Ream made during police interrogations, argued in a *Daubert* Hearing for his own expert witness, filed a motion in limine in attempt to suppress certain photographs, and adequately cross-examined all of the State's witnesses. Therefore, we are unable to find that Ream was provided with ineffective assistance of counsel.

{¶117} Accordingly, we overrule Ream's fifth assignment of error.

{¶118} Having found no error prejudicial to Ream in the particulars assigned and argued, we affirm the trial court's judgment.

***Judgment Affirmed***

**PRESTON, P.J. and SHAW, J., concur.**

**/jlr**